```
 1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
 2
      - - - - - - - - - - - - - - - x
 3    THE UNITED STATES OF AMERICA,
                                        Criminal Action No.
 4                 Plaintiff,           1:22-cr-00222-CRC-1
                                        Tuesday, October 17, 2023
 5    vs.                               2:02 p.m.

 6    RYAN KELLEY,

 7                 Defendant.
      - - - - - - - - - - - - - - - x
 8

 9    _____

10                    TRANSCRIPT OF SENTENCING
           HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
11                  UNITED STATES DISTRICT JUDGE
      _____
12    APPEARANCES:

13    For the United States:      SHANAI WATSON, ESQ.
                                   WILL WIDMAN, ESQ.
14                                 DOJ-CRM
                                   Criminal Division
15                                 950 Pennsylvania Avenue NW
                                   Washington, DC 20530
16                                 (202) 616-0245
                                   shanai.watson@usdoj.gov
17

18    For the Defendant:          GARY K. SPRINGSTEAD, ESQ.
                                   SPRINGSTEAD BARTISH BORGULA &
19                                 LYNCH PLLC
                                   28 A W. Main Street
20                                 Fremont, MI 49412
                                   (231) 924-8700
21                                 gary@sbbllaw.com

22    Court Reporter:             Lisa A. Moreira, RDR, CRR
                                   Official Court Reporter
23                                 U.S. Courthouse, Room 6718
                                   333 Constitution Avenue, NW
24                                 Washington, DC  20001
                                   (202) 354-3187
25
```

```
1                        P R O C E E D I N G S
2              THE COURTROOM DEPUTY:  Your Honor, we're on the
3     record for Criminal Case 22-222, United States of America
4     vs. Ryan Kelley.
5              Counsel, please approach the lectern and identify
6     yourselves for the record starting with the government.
7              MS. WATSON:  Good afternoon, Your Honor.  My name
8     is Shanai Watson for the United States, and with me is co-
9     counsel Will Widman.
10             THE COURT:  Okay.  Good afternoon, Ms. Watson.
11             MS. WATSON:  Thank you.
12             MR. SPRINGSTEAD:  Good afternoon, Your Honor; Gary
13    Springstead on behalf of Mr. Kelley.
14             THE COURT:  Good afternoon, Mr. Springstead.
15             Mr. Kelley.
16             All right.  The Court has read all of the
17    materials that have been submitted, the -- I'm sorry, we
18    have Ms. Gavito from probation.
19             Okay.  The Court has read all the materials that
20    have been submitted:  the presentence investigation report,
21    the memos prepared by both sides, at least some of the video
22    clips that the government has submitted.
23             And, Ms. Watson, if there are others that you want
24    to play or if there are parts that you want to highlight,
25    you should feel free, if you're prepared to do so.
```

```
1               I've also read the statement that the defendant

2      made to probation, which is excerpted in the presentence

3      investigation report.  There were also a number of letters

4      appended to the defense's sentencing memo from several

5      acquaintances of the defendant; Ms. Hahn, Ms. Barefield,

6      Mr. Coleman, Mr. Kource, and Mr. Baxi, B-A-X-I, for the

7      court reporter.

8               The Court has also received letters directly to

9      chambers from two acquaintances who worked for the defendant

10     on his campaign and a third letter from another supporter

11     back in Michigan.

12              Any other written materials for the Court's

13     consideration?

14              MR. SPRINGSTEAD:  No, Your Honor.

15              THE COURT:  Ms. Watson, any other written

16     materials?

17              MS. WATSON:  Well --

18              (Pause)

19              MS. WATSON:  No, Your Honor.

20              THE COURT:  Okay.

21              All right.  Let's start with the factual findings

22     in the presentence investigation report.  I did not see any

23     unresolved objections to the facts stated in the report.

24              Is that correct, Ms. Watson?

25              MS. WATSON:  No unresolved objections to the facts
```

1    in the report, Your Honor.  I think probation --

2              THE COURT:  If you could stand, if you want to

3    address the Court.

4              MS. WATSON:  Or should I approach?

5              THE COURT:  Come to the lectern.

6              MS. WATSON:  No unresolved facts with regard to

7    what probation submitted.  I think they had noted that it's

8    possible to do a downward variance based on --

9              THE COURT:  I'll get to the guidelines.  Just the

10   factual narrative first.  No objections?

11             MS. WATSON:  No objections, Your Honor.

12             THE COURT:  And Mr. Springstead?

13             MR. SPRINGSTEAD:  No objections, Your Honor.

14             THE COURT:  All right.  Mr. Kelley, has

15   Mr. Springstead reviewed the presentence investigation

16   report with you?

17             Just bring the mic closer to you.  You can remain

18   seated.

19             THE DEFENDANT:  He has, Your Honor.  Yes, sir.

20             THE COURT:  Okay.  And have you been satisfied

21   with his services in the case thus far?

22             THE DEFENDANT:  Yes, Your Honor.

23             THE COURT:  All right.  Hearing no objections, the

24   Court accepts the factual findings in the presentence

25   investigation report regarding the circumstances of the

1    offense; and, therefore, those facts as stated will be

2    adopted by the Court for purposes of sentencing.

3            Moving to the calculation of the federal

4    sentencing guidelines range, Mr. Kelley pled guilty to one

5    count of entering and remaining in a restricted building or

6    grounds in violation of 18 USC Section 1752(a)(1).  That is

7    a Class A misdemeanor.  It carries a statutory maximum of

8    one year and a fine up to $100,000.

9            The base offense level for that offense is found

10    at Section 2B2.3 of the guidelines.  That's Base Offense

11    Level 4.

12            There was a two-level enhancement for the fact

13    that the offense took place on restricted government

14    grounds.  There was a two-level reduction for acceptance of

15    responsibility, leading to a total offense level of 4.

16            The defendant has no criminal history, so base

17    offense level of 4 at Criminal History Category 1 results in

18    an advisory sentencing guidelines range of zero to six

19    months.

20            Pursuant to his plea agreement, the defendant has

21    agreed to pay restitution of $500 to the Architect of the

22    Capitol to help compensate for the damage done to the

23    Capitol.

24            As Ms. Watson mentioned, there is an amendment to

25    Section 4C1.1 of the guidelines that is on the horizon.

1   Because that amendment has not gone into effect, the Court

2   will not incorporate it into its calculation of the

3   guidelines range, and, for the sake of efficiency, the Court

4   will say for the record that the sentence that I impose

5   today would have been the same even if that amendment would

6   have gone into effect.

7           So with that, we have an advisory sentencing

8   guidelines range of zero to six months.

9           Any objections for the record, Ms. Watson?

10          MS. WATSON:  No, Your Honor.

11          THE COURT:  And Mr. Springstead?

12          MR. SPRINGSTEAD:  No, Your Honor.

13          THE COURT:  All right.  The probation office has

14  submitted a recommendation, and I would note that the

15  recommendation was prepared by the probation office in a

16  different district.  We have been farming out some of these

17  presentence investigation reports, which we did here.  That

18  probation officer recommended a sentence of three years

19  probation, a fine in the amount of $35,840, along with the

20  $500 in restitution as well as I believe 60 hours of

21  community service.

22          With that, would the government like to address

23  the 3553(a) factors?

24          MS. WATSON:  Thank you, Your Honor.

25          As this Court has already reviewed the briefing in

1       this case and the videos, the government will not belabor

2       the point, but we would like to highlight some of the most

3       significant aggravating factors for this case.

4               And as Your Honor is well aware, the misdemeanor

5       offenders in the January 6th riot cases fall on a spectrum

6       from the worst misdemeanor offenders, who are borderline on

7       having committed a felony, to the least culpable who maybe

8       walked into the building for a minute or less, didn't

9       encounter any police officers, didn't engage in rowdy

10      behavior, and were immediately remorseful for their conduct.

11              Here we have a defendant in Mr. Kelley who is

12      somewhere in the middle of that spectrum, not on the worst

13      side.  He didn't commit any violence.  He's not charged with

14      a violent crime.  But at the same time, we can't put him

15      into the category of the least culpable offenders based on

16      his behavior that day.  So we wanted to go through some of

17      those points.

18              THE COURT:  Okay.

19              MS. WATSON:  In terms of his behavior, Mr. Kelley,

20      when he was on the West Plaza, first on restricted grounds,

21      there were flash bang grenades going off as mentioned in the

22      memo.  Clear signs that the police wanted rioters to

23      disperse, and in spite of that he remained on the grounds.

24              He was toward the front of the mob that breached

25      that first line of officers who were defending the

1    scaffolding adjacent to the northwest stairs.  He was

2    recording while that breach occurred, and he was very close

3    to the front of the crowd.  He wasn't one of the people who

4    pushed officers, but he was a few seconds behind so he knew

5    the officers were trying to keep the people out of the

6    Capitol.

7              THE COURT:  I had a question.  You say he was

8    recording.  One of the exhibits to your memo -- I believe

9    it's either Exhibit 2 or Exhibit 3 -- is a very long video.

10   Was that taken by him?

11             MS. WATSON:  No.  I believe the video --

12             THE COURT:  That's public source.  That's other

13   public source video.

14             MS. WATSON:  Yes, yes.

15             THE COURT:  Okay.

16             And when you say he was filming, did the

17   government recover the videos that he was taking, and was

18   that included with your submissions?

19             MS. WATSON:  It wasn't included in the submission.

20             THE COURT:  Okay.

21             MS. WATSON:  I don't believe the government

22   recovered the video, but we do have video of him taking the

23   video --

24             THE COURT:  Got it.

25             MS. WATSON:  -- from the publicly available

```
 1    sources.

 2              THE COURT:  Got it.

 3              MS. WATSON:  And so he was a few seconds behind

 4    the group that forced officers to retreat on the scaffolding

 5    to head upwards.  He was one of the rioters who was climbing

 6    through the scaffolding.  He made it to the northwest stairs

 7    immediately adjacent to the scaffolding, and he continued to

 8    gesture towards the crowd while he was there.  He shouted to

 9    the crowd.  He encouraged people to move up, move closer,

10    get on the stairs.

11              There were people who were passing pieces of the

12    barricade, the metal fencing that was supposed to keep

13    individuals out of the restricted area, and there were

14    rioters who were passing it up the stairs.

15              THE COURT:  And why were they passing it up the

16    stairs?

17              MS. WATSON:  Well, they were passing it up the

18    stairs to get it to rioters who were closer to officers so

19    essentially so they could be used as weapons presumably.

20    And even though Mr. Kelley did not specifically pick up the

21    scaffolding, he supported another rioter who was trying to

22    get what appeared to be a heavy piece of metal barricade up

23    the stairs.  So he was providing support and encouragement

24    to the rioters.

25              He --
```

1          THE COURT:  Okay.  According to his statement, he

2     was simply encouraging them to make more noise so that their

3     voices could be heard.  Do you buy that?

4          MS. WATSON:  No, Your Honor.  If you look at the

5     video, there's a clear difference between the make-some-

6     noise and come-follow-me gesture, and when you look at the

7     video, it's clear that at various points he's doing the

8     come-follow-me gesture.  Get up the stairs.  Get closer.  So

9     I don't believe that's genuine.

10          And in addition to that, when he was on the

11     northwest stairs, he went on the banister and ran up the

12     banister as people were storming up trying to get closer to

13     police.  So he was engaged in rowdy raucous behavior that

14     you wouldn't normally do even if you were allowed at the

15     Capitol.  It was clear that this wasn't, you know, a

16     peaceful respectful protest.  There were many signs at that

17     point that things were out of control, and he was engaged in

18     that out-of-control behavior as well.

19          In addition, probably the biggest aggravator here

20     that you don't see in a lot of the misdemeanor cases is

21     property damage.  So the scaffolding itself had a protective

22     tarp over it because they were erecting the stage for the

23     inauguration, and even though the tarp itself had been torn

24     at parts, Mr. Kelley proceeded to create a tear in part of

25     the scaffolding that joined with another tear that was

1    already there to help create a bigger opening for rioters to

2    get through.  So that encouraged some of the rioters who

3    were in the scaffolding adjacent to the northwest stairs to

4    join with the rioters who were on the stairs who within a

5    few minutes then proceeded to overrun police.

6            THE COURT:  Now, I'm sure I'm going to hear from

7    Mr. Springstead that Mr. Kelley did not enter the building.

8    I don't think the government contends that he does.  Any

9    video evidence or any other evidence suggesting why he did

10   not?

11           I mean, I've had numerous of these cases.  Some

12   folks decide not to go in because they've been pepper-

13   sprayed.  Some folks decide not to go in because they see

14   officers, and they don't want to engage in a confrontation.

15   Others chose not to go in because they thought better of it

16   and said this is not a place that I need to be.

17           Any sense of what motivated Mr. Kelley's decision?

18           MS. WATSON:  It's unclear why he didn't enter the

19   building.  You can see from the video that the northwest

20   courtyard is very, very crowded at that time, so it's

21   possible that it just seemed like it was too crowded and too

22   difficult to enter the building at that time.  But it's

23   unclear why he didn't enter.

24           However, he did remain on restricted Capitol

25   grounds far after making it to the northwest courtyard.  He

1    was there for almost two hours engaging in this type of

2    behavior.

3              At one point he stopped to take a picture of blood

4    that was on a surface connected to the stairs, the northwest

5    stairs.  He was --

6              THE COURT:  I read that in your memo.  What

7    significance do you place on that?

8              MS. WATSON:  Well, the fact that he knew that

9    there were assaults taking place, and the fact that instead

10   of thinking that that is a sign to turn around and leave,

11   celebrating it, enjoying it, taking a picture of it.  It

12   seems clear that he was fully engaged in whatever was going

13   on at that time and, even though he wasn't part of the

14   violence, knew that violence was going on.

15             And in addition, after that day, after all that

16   behavior, there were social media posts, as you saw in the

17   briefing, where he said he didn't do anything wrong.  There

18   were no problems and essentially denied that anything

19   happened and particularly that he did anything despite the

20   fact that, again, he engaged in behavior that even if he had

21   been legally allowed to be at the Capitol he wouldn't have

22   been able to engage in.

23             So it's just a bit perplexing that he maintained

24   that for so long.  I think some of those websites were still

25   up at least until a couple of weeks ago.  So I'm not sure if

1    that's reflective of the fact that he still doesn't quite

2    believe that he did anything wrong.

3         The government does acknowledge that he accepted

4    responsibility by taking the plea, but it's unclear if

5    Mr. Kelley fully appreciates the circumstances, the fact

6    that he was on restricted Capitol grounds.

7         The 1752 that he has was because the vice

8    president of the United States was in the area.  It was a

9    day where not only the vice president was there, but two

10   houses of Congress and the police and the Secret Service,

11   the individuals charged with protecting the Capitol.  And

12   those individuals had their forces split among thousands of

13   people because there were so many people, like Mr. Kelley,

14   who decided to engage in that type of rowdy behavior that

15   would distract police and split up forces.

16        So his mere presence made that day more difficult,

17   but he also, aside from being there, engaged in behavior

18   that would make him stand out more than other individuals

19   who were at the Capitol that day.

20        THE COURT:  Okay.  The probation office, albeit

21   one from a different district, recommends a rather large

22   fine -- Mr. Kelley has some means as reflected in the

23   report -- but no jail time.

24        Could the interest of sentencing be served by a

25   large fine as opposed to jail time in this case, as

1    probation recommends?

2          MS. WATSON:  In this particular case, the

3    government wouldn't necessarily seek a fine knowing that the

4    $35,000 he advertised as raising was for his legal costs.

5    We wouldn't necessarily ask for a fine in this case.

6          However, in terms of the three years probation,

7    that recommendation I believe was issued before the

8    sentencing memos in this case were issued and I think the

9    full detail of Mr. Kelley's behavior that day was revealed.

10          So in spite of the lack of criminal history,

11    which I believe helped to drive probation's recommendation,

12    Mr. Kelley engaged not just in a bad decision, but a series

13    of bad decisions that day which would lead the government to

14    question whether or not he could fully understand the

15    consequences of his actions without a harsher sentence.

16          This wasn't, again, one bad moment.  This was

17    hours of bad moments, bad behavior of engaging in behavior

18    that you wouldn't expect someone, you know, I believe 42

19    years old, or 40 years old at the time of the January 6th

20    incident, would engage in in public, especially at the

21    United States Capitol.

22          THE COURT:  Okay.  Thank you.

23          MS. WATSON:  Thank you.

24          THE COURT:  Mr. Springstead.

25          MR. SPRINGSTEAD:  Thank you, Your Honor.

1          Your Honor, first of all, I can appreciate where

2     the United States is coming from in this matter.  Obviously

3     the Department of Justice has devoted an enormous amount of

4     resources to this case and regards it as one of the most

5     historic and important cases that it's ever had.  So I can

6     appreciate that, and I think Mr. Kelley also appreciates the

7     seriousness of this offense.

8          However, I think --

9          THE COURT:  How do I square that with his Facebook

10    posts and his campaign web page and all of the other public

11    statements that the government has highlighted?

12         MR. SPRINGSTEAD:  Well, Your Honor, you can square

13    it, first of all, by his actions here in court, accepting

14    responsibility for it.  And you're going to hear directly

15    from him today about that and exactly what transpired.

16         The social media posts, a lot of that or some of

17    that occurred before he retained counsel, and I can assure

18    the Court as soon as --

19         THE COURT:  Perhaps it's more genuine if it

20    occurred before he retained counsel.

21         MR. SPRINGSTEAD:  Maybe, but it also might not be

22    as informed.

23         I can tell the Court that when I first met with

24    Mr. Kelley and sat down and discussed the case, he was open

25    and willing to listen to me as to what transpired about

1    whether the election was sincerely stolen or not, and I

2    think I took it that he was a little surprised and taken

3    aback to find, when I told him, "Look, the president, the

4    former president, was allowed to challenge the results in a

5    number of federal courts throughout the United States."

6         THE COURT:  The number was 60, if I recall

7    correctly.

8         MR. SPRINGSTEAD:  Yes.

9         "In not one of those cases did they find any

10   irregularity that amounted -- that would change anything."

11        And I think he accepted that.  Obviously --

12        THE COURT:  Does he believe January 6th was an FBI

13   set-up, as he stated on Facebook in December of last year?

14        MR. SPRINGSTEAD:  No, I don't think he does, and I

15   think what he's going to tell you, Your Honor, is that he

16   went to D.C. with the sincere belief and question about

17   whether the election was stolen.  And a lot of that was at

18   the urging of the former president.  And much to his dismay,

19   when the former president said, you know, "Come to the

20   Capitol, we're going to show the proof of the election being

21   stolen," none of it materialized.  And I think that he feels

22   betrayed and misled by those statements.

23        And, you know, he's not putting the blame on

24   President Trump for that.  He's accepting responsibility.

25   But I think it's important for the Court to understand how

1    he got there that day, and I think it also colors his --

2    some of his interactions that day.

3            You know, I think most people, when they look at a

4    protest, they would assume that you could go to the Capitol

5    steps and protest, right?  I think most Americans probably

6    believe that's true.

7            But where Mr. Kelley clearly crossed the line was

8    when he crossed the police line and forced his way around

9    the police.

10           He clearly crossed the line when he ripped part of

11   the tarp.  He'll tell you that.  He probably got caught --

12   too caught up in it in the moment and was encouraging people

13   to come forward.

14           But I strongly disagree with the government's

15   characterization that there is no mitigating misdemeanor

16   offense like this because, if he had done anything worse, he

17   would have been charged with something worse; so, therefore,

18   it's not mitigating.  I think that's a clever way of framing

19   the discussion, by saying, "Well, if you'd done anything

20   worse, it would be worse for you, so you're lucky."

21           Well, the reality is that he showed restraint that

22   day, and he did show some very good judgment that day.

23           Now, the government says, well, he was there for

24   two hours, and points to that as a bad fact.

25           Well, the flip side of that is that he was there

1     for two hours, and he didn't engage in any violence.  He

2     didn't go into the Capitol.  He didn't make it worse for

3     himself, even though he was there.  So clearly there was

4     something internal within him that stopped him from doing

5     that, and I think that's a classic mitigating factor.

6              I mean, the fact is is that he didn't engage in

7     violence.  He didn't have any weapons.  He didn't enter the

8     Capitol, and he left of his own accord.  And those things do

9     set him apart from other defendants in this case.  And I

10    agree with the government that there's a spectrum of

11    culpability, but I disagree as to where he lands on that.

12             He lands, in my view, among the least culpable of

13    those people because the clear mark of demarcation is also

14    the Capitol.  I mean, the police lines were changing,

15    shifting, moving back as they retreated to hold their

16    ground, but everybody knew that going into the Capitol was

17    not okay, and he didn't do that.

18             And even though he's on the front lines, he's not

19    engaging, pushing, shoving, doing anything with the police

20    to make his way up there.  And, again, I think that puts him

21    on the far end of the spectrum.  There have been plenty of

22    January 6th defendants that have gone into the Capitol and,

23    you know, done worse things inside the Capitol that have

24    gotten probation.

25             And so we believe that the fact that he didn't go

1    in, didn't engage in any violence on the outside, and left

2    really sets him apart and is a very valid and good reason to

3    give him probation in this matter.  It seems to me that the

4    government's view is that when all you have is a hammer,

5    everything looks like a nail, and I think that's a good

6    example in this case.

7            Again, I appreciate why they're taking it so

8    seriously, but we can still look at the facts rationally and

9    put Mr. Kelley on a spectrum, and -- on a spectrum of

10   essentially trespassing, and even his trespassing wasn't as

11   bad as a lot of the trespassers that day.

12           So the fact that he has been rightfully held

13   accountable for his actions that day, brought to federal

14   court, charged with a federal crime, embarrassed, humiliated

15   in the press, and he'll have a federal misdemeanor on his

16   record likely for the rest of his life, I think that's a big

17   deal.  And I think it's easy for those of us in the justice

18   system to look at it, and we get a little bit numb to that.

19   But for somebody that's never been in trouble for 42 years,

20   that's a big deal, and he's taken it very seriously.

21           As far as his history and characteristics, Your

22   Honor, I also think that they weigh in favor of a

23   probationary sentence, and I agree with probation's

24   recommendation in that regard.

25           He is a really nice person.  Frankly, you know, I

1    have turned down representing other people that have

2    approached me to represent them for January 6th.  I just --

3    but Mr. Kelley, he was different.  He was -- he's been a

4    very nice, respectful person, and also really smart.  He's a

5    really sharp guy, very capable, and he has a lot of pro-

6    social family support, both from his wife -- obviously he

7    loves his kids, and he's the sole breadwinner there -- but

8    his family is very supportive.  He's got two brothers that

9    are physicians, and they're very supportive of him.

10        He wants nothing to do with politics at this

11    point.  He cares about his country.  That's why he went into

12    it, to run for governor of the state of Michigan.  He

13    thought he could make a difference and make the government a

14    better place.  And obviously he, you know, regrets getting

15    involved in January 6th, and I'm sure that he wishes that he

16    had left earlier, you know, at the first indication that,

17    hey, this is more than just a protest.

18        But fortunately, he did listen to that inner voice

19    and recognized that, hey, this is not the place for me to

20    be, this isn't right, and he left.  And I think he deserves

21    credit for that.

22        I think that -- you know, as a defense attorney,

23    my preference is always I'd take a bigger fine over jail

24    time.  In this case I was a little bit surprised by the

25    recommendation of the fine.  It's, you know, many multiples

1    of the guideline range for it, which I think is a lot more

2    appropriate for it.

3            It's true he's raised money for his defense, but

4    I can assure the Court that he's paid us more than he's

5    raised --

6            THE COURT:  You don't have to go into that.

7            MR. SPRINGSTEAD:  I know, but it was raised, and

8    when I saw the fine, we did a little bit of research, Your

9    Honor -- just to find like why are they recommending this --

10   and saw that there were other defendants that had been

11   accused at least of raising money but having maybe court-

12   appointed lawyers or raising more than they needed.  That's

13   not the case with Mr. Kelley.

14           THE COURT:  So just on that issue, just for

15   the government's benefit, I agree entirely with you,

16   Mr. Springstead.  If any criminal defendant wants to raise

17   money to pay retained counsel, I don't have a problem with

18   that.

19           I've had people, as you say, have these legal

20   defense funds when they have court-appointed counsel so

21   they're, in effect, double-dipping and using the money for

22   their own personal needs.  But if someone wants to convince

23   fellow citizens to donate money to pay private counsel, then

24   I don't have a dog in that fight.  All right?

25           MR. SPRINGSTEAD:  Thank you.

```
 1              Lastly, I would say, Your Honor --

 2              THE COURT:  Now, what you say in those fundraising

 3      appeals publicly may reflect on your acceptance of

 4      responsibility, and I think that can be considered.  But in

 5      terms of, you know, recouping that money in terms of a fine,

 6      I have some issues with that.

 7              MR. SPRINGSTEAD:  Let me just address the last

 8      point that the government made about the statements that the

 9      government still is coming at me that was still on his

10      website.

11              THE COURT:  Please do.

12              MR. SPRINGSTEAD:  That was posted in February --

13              THE COURT:  Because he wants to expose the truth

14      about what happened on January 6th, I think that statement

15      continues.

16              So if you would address that, I would appreciate

17      it.

18              MR. SPRINGSTEAD:  Sure.  The context of that post,

19      it was posted in February of 2023, and it's true it remained

20      when the government said it remained on his website.

21              THE COURT:  And when was his plea?

22              MR. SPRINGSTEAD:  His plea was about three months

23      ago.  So that was while we were prepping for trial, getting

24      ready for trial, and it correlated with, you know, basically

25      an appeal to -- it's not a GoFundMe, but it's essentially a
```

1    GoFundMe to raise money for his defense if he was going to

2    go to trial, and he didn't.  He chose to plead to the

3    misdemeanor here and accept responsibility, although I'm not

4    sure the guidelines would be any different if he had gone to

5    trial and were convicted.  They still might be zero to six

6    months.

7         But I say that because --

8         THE COURT:  They could be consecutive however.

9         MR. SPRINGSTEAD:  I'm sorry?

10         THE COURT:  They could be consecutive.

11         MR. SPRINGSTEAD:  True.

12         THE COURT:  Yes.

13         MR. SPRINGSTEAD:  I say that because I think it

14    means that he is sincere in accepting responsibility for

15    what he did.  He recognized that what he did was wrong, and,

16    you know, quite frankly he wants to put it behind him and

17    move on to the things that matter most to him, which are his

18    six kids and his wife and take care of them and put this

19    behind him as best he can.

20         And the fact that he's been on pretrial release

21    for I think it's about 16 months with no issues whatsoever I

22    think tells the Court that this is a person that is capable

23    of following the law.  He's been under the careful

24    supervision of the federal government, and he's had no

25    brushes with that, no incident.  He's able to conform his

1    behavior, so specific deterrence I don't believe should be a

2    factor that weighs in favor of incarceration.

3            And I stated what I believe about general

4    deterrence.  Obviously the government's right.  They want

5    to deter this type of behavior in general, but I'm not

6    sure that the weight of that deterrence needs to fall on

7    Mr. Kelley in this case given his conduct.  And I think it

8    can be borne out through people that go into the Capitol,

9    that commit felonies.  Certainly they've been viewed as --

10   the government's taking it as seriously as possible in

11   asking for jail time in excess of sometimes what the

12   guidelines recommend even.

13           So I don't think there's any doubt that the public

14   is going to take this case seriously and be deterred from

15   doing it again.  I don't think that anybody that viewed

16   Mr. Kelley's case separately would view it any different.

17           So for those reasons, Your Honor, we're requesting

18   no further incarceration and a period of probation.

19           THE COURT:  Okay.  Thank you.

20           Mr. Kelley, please join Mr. Springstead.  Is there

21   anything you want to tell me before I impose your sentence?

22           And if there's anyone you'd like to introduce in

23   the audience, feel free to as well.

24           THE DEFENDANT:  Not at this time, Your Honor.

25           THE COURT:  Okay.

1          THE DEFENDANT:  Thank you for the opportunity to

2     speak.  And I think Mr. Springstead has covered a lot of the

3     information, but maybe it's a little different if you hear

4     it directly from me as well.

5          I went to Washington, D.C., on January 6th because

6     there was, at that time in our nation, a lot of different

7     things being shared about the 2020 election that happened,

8     and one of those things were that there is going to be

9     massive amounts of information shared showing that there was

10    election fraud.  There was a post from the former president

11    that stated that basically verbatim.  And I believed that,

12    and I wanted to go, and I wanted to see what those receipts

13    were.

14          Those receipts never came.  They didn't come that

15    day, and they still have not come to this day, to my

16    disappointment and to many others' disappointment.  That is

17    a betrayal, and I was misled into believing those things and

18    went there.

19          And there were lines that I crossed that day, Your

20    Honor.  And I think sometimes in a written statement maybe

21    you don't fully understand where someone's coming from or

22    how they truly feel.

23          And so today in person, in front of you, looking

24    at you, I want to own all of the actions that happened that

25    day from crossing the police line to being loud, rowdy,

1    encouraging people to get loud, come further ahead, all of

2    the things that have been stated here in the courtroom

3    today, including ripping the tarp.  I own all of those

4    things.

5            Those things were wrong.  That is not how people

6    should conduct themselves at a protest, and I'm sorry for

7    those reasons.  Moving forward, I know that those type of

8    actions are not things that I would partake in when I come

9    to a protest.

10            I think of the question that was asked today of

11   why didn't I go inside of the Capitol building that day, and

12   I would like to address why I did not go inside the Capitol

13   that day.

14            While I was there and mentioned that the receipts

15   were coming for whatever happened during the 2020

16   election -- Your Honor, I've been around different

17   individuals that are protected by Secret Service, and I do

18   know that there's a certain protocol that needs to happen in

19   order for someone to get in front of whether it's the vice

20   president or the president or other individuals, and knowing

21   that they were inside of the building, I thought maybe at

22   some point we would have that protocol that would allow

23   people in.

24            But before that, as I got closer to the Capitol, I

25   did see people climbing on the second story of the Capitol

1    building, and to me that was a sign that that's not how you

2    enter the Capitol building.  And it was a gut feeling, I

3    guess you could say, at that time that I knew there was

4    something that was happening that the reason to go inside

5    the Capitol building diminished for me.

6         So I made the choice consciously to stay outside

7    and continue to protest by being loud, yelling, you know,

8    "USA," "Come on," showing support for whatever the receipts

9    were going to be on the inside of the building to show

10   everything that had happened to the 2020 election.  And to

11   this day those receipts never showed up.

12        So that day I was misled, but I own the actions.

13   I was loud, I was where I shouldn't have been, and I know

14   that that's not how we should conduct ourselves at protests.

15        There's many protests that I've put together

16   personally myself, and I believe that in one of the letters

17   you saw some of those descriptions of how that came

18   together.

19        The protests that I had put together were very

20   peaceful, and even in that confrontational situation that we

21   shared with you, we were able to deescalate it, find common

22   ground, and be able to continue on with our protests.  And

23   those are how protests should go.

24        But that's not what happened on January 6th, and I

25   own those actions, Your Honor.  And I apologize for those

1    things.

2            Moving forward, as Mr. Springstead said, with

3    politics, at this time I have no interest in -- even though

4    I know I have a First Amendment right going to protests or

5    running for office or any of those type of things, I have a

6    family to take care of.  I have six children that I need to

7    continue to provide for and be a father for, and so I need

8    to focus on my business.  I need to focus on raising my

9    family and not being drawn into these things where the

10   former president, for example, misleads people in a certain

11   direction and brings you into a situation that ultimately

12   ends you in federal court.

13           And it's not his fault, the former president, for

14   my actions that day.  He did invite us there.  But my

15   actions are my actions, and I own those.  I don't push those

16   off on someone else.  And so for whatever that means looking

17   at you today and sharing those things, I am sorry for those

18   things, and I know that they were wrong.

19           And I know that my family is proud of me for

20   standing for what I believe in even though if what I

21   believed in at the time was not necessarily accurate.  I

22   didn't hurt anyone, and that is evident by the fact that

23   there is no violent crimes being charged.  That is evident

24   by the fact that even the government states that I was not

25   violent that day.  I was there for an extended period of

1    time, and I engaged in no violence with anyone.

2    And so, Your Honor, I'm willing to accept whatever

3    sentence it is that you impose today.  I will respectfully

4    honor that and follow through with those things to make

5    right for the wrongs that I've done.

6    That's all, Your Honor.

7    THE COURT:  Thank you.

8    All right.  Mr. Kelley, as you can imagine, we get

9    a lot of these cases.  There have been 1,200 defendants

10    prosecuted thus far.  I don't know -- I've lost count of how

11    many I've had, probably 70 or 80.

12    Each one is different.  We take them very

13    seriously, and we try to do our best to sentence defendants

14    based on their own unique characteristics and what they did

15    and what their situation is.  And we take a lot of

16    information into account, and I trust that you know that

17    I've tried to do that in this case.

18    I am not the kind of judge that lectures

19    defendants, but I do have an obligation to explain to you

20    where I've come out and why.  All right?

21    As the government says, you're certainly not the

22    most culpable of the defendants that I've seen.  No direct

23    violence.  You weren't an organizer.  You didn't assault

24    anybody.  You didn't go into the building, and all of those

25    factors explain why you have a misdemeanor plea as opposed

1    to a felony plea.

2            But as Ms. Watson points out, there are gradients

3    of seriousness and culpability amongst all of our

4    misdemeanor defendants, and your range is zero to six.

5    That's the place that I have to start.  That's what the

6    Sentencing Guidelines say.

7            And so the question is where do you fall within

8    that range, right?  And that's what I've tried to decide.

9            We've gone over some of the mitigating factors.

10   There are some aggravating factors.  You were at the front

11   of the first group of rioters that overwhelmed officers on

12   the northwest stairs.  That was a very important flash point

13   because it led to that terrace, and that was the first place

14   that the Capitol was breached.

15           And I've had two jury trials where all of the

16   evidence has been about what happened on those stairs, so a

17   lot of the videos that the government has given me in this

18   case I've already seen ad nauseam.  I know a lot of the

19   players.  I know what they did.  I know why they were

20   passing up those bike racks.  I know what happened with the

21   bike racks.  You know, I know that some of those folks had

22   weapons.  Some of them went to trial and ultimately -- you

23   know, after they got into the building.  Some didn't go into

24   the building.

25           I had a gentleman named Mr. Alberts, who was right

1    on those stairs with you, who used a construction pallet

2    right by that scaffolding where folks were constructing the

3    inaugural stage and used it as a battering ram to overwhelm

4    the police.  He didn't go in either, but he stayed.  He

5    shouted a lot.  He threw stuff at officers, and he had a

6    loaded Glock with him in a backpack.

7              THE DEFENDANT:  A loaded Glock?

8              THE COURT:  A gun, an automatic weapon.

9              THE DEFENDANT:  Oh.

10             THE COURT:  All right.  And he went to trial and

11    he was sentenced to serious jail time.  So just because

12    you don't go into the building -- I'm not comparing you to

13    Mr. Alberts necessarily, but that was a particular flash

14    point that day, and it was a very important police line that

15    was overwhelmed.

16             You saw all that in front of you based on where

17    you were, but instead of avoiding it, you called up more

18    people, helped others pass up those bike racks, and then you

19    charged up the stairs yourself.

20             And I watched the video.  You weren't just

21    encouraging folks to make noise.  You were encouraging them

22    to join you to get up to the terrace and ultimately into the

23    Capitol.

24             And as you say, you tore down the tarp, and what

25    that did is allow a bunch of folks to get underneath the

1  scaffolding to encircle the police who were on that line

2  trying to hold that line just above you up the stairs.  And

3  you stayed on the grounds for two hours knowing full well

4  that you weren't supposed to be there, and afterwards -- and

5  we didn't talk about this, but I think you misused the

6  platform that you had as a candidate for elected office to

7  minimize and, frankly, to lie about what happened.  Okay?

8          And you say that you were misled and that you went

9  there with the best intentions because you felt that there

10 would be information about the stolen election, but yet a

11 year later, in December '21, you tell your supporters on

12 Facebook you were in D.C. protesting the fraudulent election

13 and doing the right thing in doing so.  That's a year later.

14         And two years later you tell your supporters that

15 J6 was an FBI set-up, right?  You know, by that time you'd

16 had plenty of time to reflect -- you're a smart guy

17 obviously -- and to learn about all those court cases and to

18 reflect on the accuracy of the information that was being

19 given to you and others on the day that may have caused you

20 to go in the first instance.

21         So, you know, you may have gotten caught up in the

22 moment in a sense, but you had time to reflect, and those

23 were your thoughts even after a year and two years of

24 reflection.

25         And you continued to, you know, fund-raise off

1    your participation.  As I said, you have a right to raise

2    legal fees to pay Mr. Springstead.  He's a very good lawyer.

3    I'm sure he doesn't come cheap.  But I can take into account

4    what you say in those appeals in assessing how genuine your

5    remorse is here today.

6              You mentioned, or Mr. Springstead may have

7    mentioned, that this was a trespass offense in effect.

8    Okay?  And I hear that a lot.  All right.  But as you

9    acknowledge, the offense that you pled guilty to involved

10   being in a restricted area, and it's restricted because

11   there were people who were protected by the Secret Service

12   that day.

13             And I can't think of a more difficult and

14   important job that those Secret Service agents play or have

15   to protect the president, the vice president, and other

16   protectees regardless of political party.  Okay.  And they

17   have a really hard job because people try to assassinate

18   those folks.  All right.  And it makes their job a hell of a

19   lot more difficult if any Tom, Dick, or Harry can go into a

20   restricted area and interfere with their ability to do their

21   jobs.

22             And folks who went into the building certainly did

23   that, but folks who diverted attention to the terrace and

24   outside of the building and engaged with law enforcement and

25   prevented the motorcade -- which was sitting right outside

1     the Capitol, not in the building -- from being able to

2     freely move also interfered with the Secret Service's

3     ability to do their job.

4          We also take into account your history.  To your

5     credit, you've never been in any legal trouble before.  You

6     seem to be a good family man.  You have the support of your

7     family and friends, and I have taken those things into

8     account.

9          I've talked about remorse.  You know, sometimes

10    it's hard to assess.  As you can imagine, I get a lot of

11    people telling me they're sorry.  I think some are very

12    genuine, particularly those who express it right away and

13    not years later.

14         In your case, I have some serious concerns whether

15    you are truly remorseful and therefore have accepted

16    responsibility for what you've done, and it's made, I think,

17    more serious by the fact that you do have a public platform

18    where people listen to you.  You know, a lot of folks voted

19    for you.  A lot of folks followed you.  All right.  And with

20    that comes a responsibility for not peddling in falsehoods

21    and conspiracy theories like J6 was an FBI plot or whatever

22    it is.  Okay?

23         All right.  We talk a lot about disparities, what

24    other people have been sentenced to for similar conduct, and

25    I am confident that the sentence that I will impose is

1    within -- would not create any undue disparities.

2         So taking all of these factors into account, I

3    agree with the government that some term of imprisonment is

4    called for in this case.  And, again, perhaps not for

5    specific deterrent reasons.  You know, I really hope that

6    you wouldn't do anything close to like this again, but it is

7    important for us to send a message, particularly for people

8    who are in positions of responsibility like yourself, that

9    this can never happen again.  All right.

10        So with that, pursuant to the Sentencing Reform

11   Act of 1984 and in consideration of the provisions of 18 USC

12   3553, it is the judgment of the Court that you, Ryan Kelley,

13   are hereby sentenced to a term of 60 days of incarceration

14   followed by one year of supervised release on Count 1.  In

15   addition, you are ordered to pay a special assessment of $25

16   in accordance with 18 USC 3013.

17        While on supervision, you shall abide by the

18   following mandatory conditions as well as all discretionary

19   conditions recommended by the probation office in Part D,

20   "Sentencing Options of the Presentence Report," which are

21   imposed to establish the basic expectations of your conduct

22   while on supervision.  These mandatory conditions include

23   you must not commit another federal, state, or local crime.

24   You must not unlawfully possess a controlled substance.  You

25   must refrain from any unlawful use of a controlled

1    substance.  You must submit to one drug test within 15 days

2    of placement on supervision, and at least two periodic drug

3    tests thereafter as determined by the Court.

4         You must make restitution in accordance with 18

5    USC Sections 3663 and 3663A or any other statute authorizing

6    a sentence of restitution.

7         The Court will transfer supervision of this matter

8    to the United States District Court for the Western District

9    of Michigan, but will retain jurisdiction.  What that means,

10   Mr. Kelley, is I would not anticipate any violations of your

11   conditions of release, but if there were to be a violation,

12   that would come back to me, and you might have to come back

13   to D.C. to explain yourself for it, so let's make sure that

14   does not happen.

15        You shall also comply with the following special

16   conditions.

17        Financial information disclosure.  You must

18   provide the probation office access to any requested

19   financial information and authorize the release of any

20   financial information.  The probation office may share

21   financial information with the U.S. Attorney's Office.

22        Firearm restriction.  You shall remove firearms,

23   destructive devices, or other dangerous weapons from areas

24   over which you have access or control until the term of

25   supervision expires.

1          The Court finds that you do have the ability to

2     pay a fine, specifically in the amount of $5,000.  The Court

3     determines that you do not have the ability to pay interest

4     and therefore waives any interest or penalties that may

5     accrue on that balance.

6          You are ordered to make restitution in the amount

7     of $500 to the Architect of the Capitol.  The Court

8     determines that you do not have the ability to pay interest

9     and therefore waives any interest or penalties that may

10    accrue on that balance.

11         You must pay the restitution and financial penalty

12    in accordance with the schedule of payments sheet on the

13    judgment.  You must also notify the Court of any changes in

14    economic circumstances that might affect the ability to pay

15    this financial penalty.

16         Having assessed your ability to pay, payment of

17    the total criminal monetary penalties is due as follows.

18    Payment in equal monthly installments of $550 over ten

19    months -- that's the $500 in restitution plus the $5,000

20    fine -- to commence after the date of this judgment.

21    Restitution payments shall be made to the clerk of the Court

22    for United States District Court, District of Columbia, for

23    further disbursement to the Architect of the Capitol.

24         The special assessment is immediately payable to

25    the Clerk of the Court.  Within 30 days of any change of

1    address, you shall notify the Clerk of the Court of the

2    change until such time as the financial obligation is paid

3    in full.

4        The probation office shall release the presentence

5    investigation report to all appropriate agencies including

6    the United States Probation Office in the approved district

7    of residence in order to execute the sentence of the Court.

8    Any treatment agencies shall return the presentence report

9    to the probation office upon your completion or termination

10   from treatment.

11       You can appeal your conviction if you believe that

12   your guilty plea was somehow unlawful or involuntary or if

13   there is some other fundamental defect in the proceedings

14   that was not waived in your plea agreement.

15       Under some circumstances a defendant also has the

16   right to appeal the sentence.  However, a defendant may

17   waive that right as part of a plea agreement, and you have

18   entered into a plea agreement which waives some of your

19   rights to appeal the sentence itself.  These waivers are

20   generally enforceable, but if you believe the waiver itself

21   is not valid, you can present that theory to the appellate

22   court.  You also have the right to challenge the conviction

23   entered or sentence imposed to the extent permitted by 28

24   USC 2255 and your plea agreement.

25       Any notice of appeal must be filed within 14 days

1    of entry of judgment or within 14 days of the filing of a

2    notice of appeal by the government.  If you are unable to

3    afford the cost of an appeal, you may request permission

4    from the Court to file an appeal without cost to you.  On

5    appeal, you may also apply for court-appointed counsel.

6              Any other objections by the government?

7              MS. WATSON:  No, Your Honor.

8              THE COURT:  Mr. Springstead?

9              MR. SPRINGSTEAD:  No, Your Honor.

10             THE COURT:  Okay.  Ms. Gavito?

11             You can have a seat, sir.

12             THE PROBATION OFFICER:  Your Honor, would the

13    Court be inclined to allow him to voluntarily surrender?

14             THE COURT:  Ms. Watson, any objection to voluntary

15    surrender?

16             MS. WATSON:  The government will not object.

17             THE COURT:  Okay.  Mr. Kelley, what will happen

18    next is that the Bureau of Prisons will designate you to a

19    facility.  Given the relatively short amount of jail time,

20    it may be to a local facility near where you live.

21    Sometimes they have arrangements with local facilities.  I

22    don't know what the arrangement might be in Michigan, but,

23    Mr. Springstead, presuming there is no arrangement, would

24    you like to make a recommendation of placement?

25             MR. SPRINGSTEAD:  Recommendation close to family,

1    Your Honor.

2         THE COURT:  Okay.  We will recommend a facility as

3    close to home as possible.

4         And, Ms. Watson, do we need to dismiss the

5    remainder of the charges?

6         MS. WATSON:  Yes, please, Your Honor.

7         THE COURT:  Okay.  So moved.

8         Anything else, Counsel?  I don't believe so.

9         MR. SPRINGSTEAD:  No, Your Honor.

10        THE COURT:  Mr. Kelley, I often tell defendants

11   that they should not be judged by the worst mistake that

12   they made, and you certainly made a doozy here, but you're

13   still a young man, and fortunately you have lots of years in

14   front of you, and let's see if we can make the best of them.

15   And you have a supportive family and set of friends, it

16   seems, so I have no doubt that you will be able to do that.

17        Good luck going forward.  Nothing personal, but I

18   hope not to see you again.  Okay?

19        THE DEFENDANT:  Yes, Your Honor.  Thank you.

20        THE COURT:  All right.  We're adjourned.

21        MS. WATSON:  Apologies, Your Honor.  The

22   government also requests that the video exhibits be made

23   public.

24        THE COURT:  So moved.

25        (Whereupon the hearing was concluded at 2:59 p.m.)

1          <u>**CERTIFICATE OF OFFICIAL COURT REPORTER**</u>

2

3               I, LISA A. MOREIRA, RDR, CRR, do hereby

4     certify that the above and foregoing constitutes a true and

5     accurate transcript of my stenographic notes and is a full,

6     true and complete transcript of the proceedings to the best

7     of my ability.

8          Dated this 7th day of November, 2023.

9

10                                    <u>/s/Lisa A. Moreira, RDR, CRR</u>
                                     Official Court Reporter
11                                   United States Courthouse
                                     Room 6718
12                                   333 Constitution Avenue, NW
13                                   Washington, DC 20001

14

15

16

17

18

19

20

21

22

23

24

25